## A. & E. PITMAN MFG. CO., Inc., v. PITMAN et al.

### No. 2453.

Circuit Court of Appeals, First Circuit.

June 10, 1931.

BINGHAM, J., dissenting.

Odin Roberts, of Boston, Mass. (Richard F. Walker and Roberts, Cushman & Woodberry, all of Boston, Mass., on the brief), for appellant.

Franklin F. Phillips, of Boston, Mass., for appellees.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

## On Rehearing.

WILSON, Circuit Judge.

On defendants' petition for rehearing, the court has carefully considered the rearguments, oral and written, of learned counsel, and reached the conclusion that the judgment of the District Court should be affirmed.

The invention relates to a frying apparatus for cooking food in fat or oil, and its object is to provide an apparatus whereby the flavor of the food cooked will not be imparted to the cooking medium so that it may, if desired, be used successively for cooking different kinds of food.

There are two claims in issue—claims 1 and 4. Claim 1 is as follows: "Frying apparatus, comprising in combination a cooking-medium container provided with a depending extension, and means for applying heat to the cooking-medium above said extension whereby the sediment from the food which falls into said extension is maintained at a lower temperature than the cooking-medium in the upper part of the container."

The fourth claim is like the first, only it contains as an additional element in the combination a frying basket to hold the food while being cooked.

It has been discovered that the cause of the contamination of the cooking medium or fat was due to the carbonization of particles of the food during the cooking coming in close contact with the bottom of the ordinary kettle to which the heat was in common use directly applied. The function of the plaintiff's patented apparatus was to prevent this carbonization, which he accomplished by constructing his container with sloping sides to which the heat was directly applied, and with a depending extension below the point where the heat was applied, into which the débris fell, and which was relatively cool.

The alleged infringing apparatus of the defendants performs the same function of preventing carbonization of particles of food by inserting within a kettle of conventional shape, with a slightly rounded bottom, an inverted metal cone having a series of holes around the base of the cone, or the top, as we shall hereafter designate it, and at a fixed distance below the rim, and also holes about two thirds of the way toward the apex, or the bottom of the cone, as for convenience we shall refer to the part in the bottom of the kettle. The holes at the bottom of the cone are covered with a metal gauze to prevent particles of food escaping from the cone at the bottom. The cone is truncated near the apex and a plug inserted, which fits snugly into a drain or draw-off pipe in the bottom of the kettle to prevent any débris escaping around the edges of the truncated apex and into the bottom of the kettle, and finally coming in contact with the hot part of the kettle or very hot fat and carbonizing. The apparatus of the defendants, therefore, in no way resembled the plaintiff's in form, either with respect to the sloping sides, or as to any depending extension of the kettle, the drain pipe at the bottom of the defendants' kettle in no way resembling the depending extension of the plaintiff's nor serving the same function.

The issue in the case is whether the apparatus constructed by the defendants is the equivalent of the plaintiff's. It, of course, accomplished the same result. Both rely on the same principles of physics that heated liquids rise and the cooler liquids and heavier particles of food sink. The defendants, however, rely upon the additional facts, and as an essential feature of their apparatus and to its successful operation, viz.: That fat or oil is a relatively poor conductor of heat, and that the lower part of the inverted cone below the lower ring of holes, being immersed in this poor conductor and at a considerable distance from the point of the kettle where the heat is applied, is kept below a charring temperature.

The essential element of the plaintiff's invention is the application of the heat entirely above a depending extension suitable for collecting the débris; while the defendants' apparatus, as Exhibits A, B, and C show, applies the heat to their kettle at a point some distance below a line on the cone up to which the débris may be allowed to collect without interfering with its successful operation, and the heat could undoubtedly be applied still lower than is shown by the exhibits without charring the débris in the cone.

The District Court found as facts that any débris which escaped in the bottom of the kettle, as might occur when the plug in the drain pipe above described was not used, would eventually char, and that the heat was not applied above that part of the defendants' cone in which the débris was collected. We do not think his findings were clearly wrong. Stratton v. Buller et al. (C. C. A.) 268 F. 823, 825; Keeton v. Jefferson Standard Life Ins. Co. (C. C. A.) 5 F.(2d) 183, 188.

The finding of the District Court that if particles of food did escape into the kettle

from the cone they would eventually char, is not overcome, we think, by the appearance of the Exhibits B and C, which show the bottom of the kettle clean and a rim of blued steel where the flame impinged, since it does not satisfactorily appear what the conditions were under which the tests were made by the plaintiff, the kettles being supplied to them new for the purpose by the defendants. Plaintiff's manager testified that in making the tests, heat was first applied without any liquid in the kettles. If they used a plug, no débris could escape to leave any discoloration on the kettle.

We think but little weight can be given to these exhibits as evidence of the result of use under ordinary conditions, which is shown by Exhibit A, the bottom of which is also discolored, as well as the sides. A significant fact does appear, however, from Exhibits B and C, whatever the conditions were under which the tests were made, that the ring of blued steel on the inside shows where the hottest part of the kettle is when in use, and that it was below the bottom of the lower series of holes in the cone, and below where a part, at least, of the débris would be collected before it became necessary to empty the cone.

Counsel for plaintiff labored in argument to show that the flame from the circular gas ring, by means of which the heat was applied to the defendants' kettle, although the holes through which the gas was vented was directed inward at an angle of 45 degrees and against the rounded edge of the bottom of the kettle, by reason of an upward current of cooler air, induced by the heat of the flame, bathed the vertical sides of the kettle, and thereby applied the heat above a point below which the débris is collected in the cone, and left the bottom of the kettle and the fat in the bottom, or apex, of the cone below a charring temperature, and thus converted it into an equivalent of the plaintiff's depending extension.

Counsel carefully omitted in presenting this point in argument the well-known fact that gas for domestic uses is always supplied under pressure, against which any current of air drawn upward inside the heated gas ring would have but little effect in forcing the ring of flame vertically upward. Plaintiff's expert admitted that when the gas was turned on with full force the flame was directed against the kettle at an angle of at least 30° instead of vertically.

The flame striking the kettle at or near the top of the rounded bottom might have a tendency within certain limits to bathe the sides of the kettle, but the point of greatest heat as Plaintiff's Exhibits B and C conclusively indicate, was on the rounded part and below the apertures in the bottom of the defendants' cone, and sustain the evidence of the defendants' witnesses that without the cone the defendants' apparatus would not produce the desired result.

It is a generally accepted fact that heat is conveyed through metal by conduction equally in all directions. The opinion of the plaintiff's expert that a current of cool air, induced by the heat of the gas flame striking the bottom of the kettle, would tend in any appreciable degree to prevent the heat being conducted downward along the bottom of the kettle, seems to have been demolished, as the opinions of experts often are, by the facts testified to by the defendants' witnesses, if believed, that débris escaping into the bottom of the kettle would and did char.

The course of the current of oil or fat in defendants' apparatus, as contended by the plaintiff's counsel, is not proven by any evidence and could not be. The oil or fat nearest to the sides of the kettle where the heat is applied, is, of course, the hottest and rises rapidly, flows into apertures in the top of the cone, cools through radiation and contact with the materials in process of cooking, and descends, and, no doubt induced by the upward current of oil outside the cone, flows out through the lower apertures. It cannot, however, then be hot enough to rise again to the top until reheated, nor will it stay in suspension until heated by conduction with the hot fat near the sides of the kettle. A more reasonable inference as to its course on the outside of the cone is that the oil nearest the point of contact of the flame on the kettle, being the hottest, rises first, and its place is supplied chiefly by the oil below it. The result, therefore, is not a dead body of oil in the bottom of the defendants' kettle, but a circulating body with that nearer the sides of the hot kettle making its way into the upward stream, and that nearest the sides of the bottom of the cone descending and then gradually making its way upward along the increasingly heated sides of the kettle to its hottest point, and into the upward stream to the top of the cone. That some of the oil coming out of the vents in the cone may also come in contact with the ascending hot oil and be carried to the top, would not prevent the remainder of the cooler oil, as it emerged from the cone, from descending and keeping

the lower part of the cone bathed in a relatively cool liquid, while the oil nearest the metal bottom of the kettle would tend to rise both in temperature and location until it reached the point of contact of the gas flame, when it would reach the hottest point.

This, at least, is supported by the facts testified to by the defendants, and supports the finding by the court below that débris escaping into the bottom of the kettle will char.

It was also suggested by counsel for the plaintiff that the defendants' cone constitutes the container described in the plaintiff's claim 1, and by the heated fat or oil rising to the top, the heat by convection is thus applied above the bottom of the inverted cone where the débris collects, and is, therefore, an equivalent of the plaintiff's invention; but to call a metal cone full of holes a container would be a strained construction even to sustain a pioneer patent.

It is true that the plaintiff's patent is a pioneer patent and entitled to a liberal construction, but to give it the broad scope contended for by the plaintiff would amount to a patent on the function, viz.: That of protecting from carbonization the particles that always separate from the materials being cooked during the process of frying in deep fat or oil. Bryce Bros. Co. v. National Glass Co. (C. C. A.) 116 F. 186; Werner v. King, 96 U. S. 218, 239, 24 L. Ed. 613; Burr v. Duryee, 1 Wall. 531, 17 L. Ed. 650.

As the court said in Bryce Bros. Co. v. National Glass Co., supra, page 192 of 116 F.: "Care must be taken, however, in all cases, that we do not, by an uncalled for application of the doctrine of equivalents, practically give to the patentee a monopoly of the function of his mechanism."

The decree of the District Court is affirmed, with costs.

BINGHAM, J., dissents.